## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KEX DISTRIBUTION,<br>a Utah limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>THE HANOVER INSURANCE COMPANY,<br>a New Hampshire corporation,<br><br>Defendants. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>Case No. 2:20-CV-874-HCN-CMR<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Plaintiff Kex Distribution sues Defendant Hanover Insurance Company, asserting various state-law claims.[1] Hanover moves for summary judgment on all of Kex's claims and Kex moves for partial summary judgment on the issue of damages. The court grants Hanover's motion and denies Kex's motion as moot.

## I.

Kex provides transportation services for vendors throughout areas of the Mountain West, including Utah and Colorado. *See* Dkt. No. 64-4 at 19–21. Kex conducts its business using trucks driven by its own employees as well as trucks driven by "owner-operators." Dkt. No. 69-1 at 318. Owner-operators, also called sub-haulers, "are drivers that meet the contract carrier's requirements for driving that choose to own their own trucks and drive those trucks under contract." *Id.*

---

[1] Although Kex also named CSDZ, LLC as a defendant, it failed to allege CSDZ's citizenship properly for purposes of diversity jurisdiction. *See* Dkt. Nos. 2, 71–73. The court ultimately dismissed CSDZ as a party under Federal Rule of Procedure 21. *See* Dkt. No. 73. It is the court's understanding that Kex has settled its claims against CSDZ.

**A.**

In 2018, Kex was in the market for motor truck cargo (MTC) insurance and worked with

CSDZ insurance Graden Marshall to secure a policy. *See* Dkt. No. 64-4 at 55–56. Mr. Marshall

provided Kex a proposal from Hanover that would provide up to $1,250,000 coverage for

"property in vehicles." Dkt. No. 2-1 at 19.

While negotiating the policy, Kex inquired whether cargo carried for it by owner-

operators would be covered under the policy. Mr. Marshall exchanged multiple emails with

Hanover about this question.

On July 6, 2018, Mr. Marshall asked:

> I had a quick question with regards to the following insured: Kex Distribution
> LLC policy #IH4 D098474 01. They currently have sub-haulers as well as
> independent contractors that they have utilized in delivery of their cargo goods for
> their clients. Will Hanover have any issues extending coverage for their sub-
> haulers and independent contractors for coverage on the motor truck cargo?
>
> As you are aware, none of the cargo goods are owned by KEX Distribution but I
> wanted to make sure that we will have a clear understanding with regards to when
> the cargo delivery is sent through sub-haulers and independent contractors.

Dkt. No. 64-13 at 3–4.

Myra Mares from Hanover answered the same day: "Good Afternoon Graden,

unfortunately [we] can't write the other unknown haulers on our Motor Truck Cargo form." *Id.* at

2. Mr. Marshall followed up that evening: "Myra, Let me clarify some things, we currently

insure their vehicles on our auto policy as well as list them as drivers on the policy. You had

mentioned unknown haulers but they will be listed as known drivers, does that change

anything?" *Id.*

The record does not include any response to this specific email, but Mr. Marshall sent Mr.

Gilson, Kex's Vice President of Operations, the following by email the same day:

2

> I have not heard back yet from our current carrier on whether or not we can
> extend coverage to the independent contractors. I think when we originally spoke
> about this the understanding was that the insurance would be covered under the
> independent contractors policy.
>
> Regardless of that I still think that it is necessary that we at least get the
> Contingent Cargo and the Contingent Auto liability coverage that we have
> discussed in the past.
>
> Would you be able to complete the attached and send it back to me?
>
> Give me a call with any questions on this, I will let you know as soon as I hear
> back from our current Motor truck cargo underwriter.

Dkt. No. 64-15. It appears from this email that Mr. Marshall attached an application form for a

contingent cargo and contingent auto liability policy to this email. *See id*.

> Three days later, Mr. Marshall followed up:
>
> Per our conversation on Friday, I have attached a semi completed application for
> your contingent auto liability as well as your contingent cargo coverages. Will you
> please review the attached and make sure that every question that has been
> previously completed is approved prior to signing.
>
> If you have any questions about this, please don't hesitate to call me. Also will
> you complete the blank questions and details as well.

Dkt. No. 64-16. Mr. Gilson returned the application to Mr. Marshall a few days later, stating that

he had added what information he could and hoped it was enough to get a quote. *See* Dkt. No.

64-17 at 4.

Mr. Marshall and Mr. Gilson continued to discuss the need for contingent cargo coverage,

with Mr. Marshall recommending that Kex apply for "brokerage authority" from the Federal

Motor Carrier Safety Administration in order to facilitate obtaining such insurance. *Id*. at 3–4. In

response to Mr. Gilson's statement that "the Cincinnati guy said we didn't need it," *id*. at 3, Mr.

Marshall responded as follows:

> I would highly recommend we get started on our filings for the brokerage
> authority, I understand that Cincinnati may be on a different page with this but in

3

order for us to get contingent cargo coverage we really need to have brokerage
authority in place. Since this is such a grey area, I do think this is a high-risk for
us and we need to really make a push in order to get the brokerage authority in
place.

*Id.* at 2.

On October 18, 2018, Mr. Marshall sent Ron Sexton at Hanover another email raising the

same question he had asked before:

The question of coverage for owner-operators came up again and I wanted to run
it by you to see what options you/we may or may not have. They have one third-
party company that is requiring coverage for owner operators while doing their
loads, is there any way that we can list all of the owner-operator vehicles and
provide cargo coverage for them? If we do that then we would just have KEX
distribution figure out a way to collect the premium from the owner-operators
directly.

Dkt. No. 64-14 at 3. Mr. Sexton replied, "I had a couple of discussions on MTC for various

accounts and we are not a market for haulers that we can't underwrite for. If any of these

owner/operators are independent and subcontracting then they will need to have their own

coverage in place." *Id.* at 2. Mr. Marshall responded, "Sounds good, that's what they thought

they just wanted to reconfirm. They were hoping to just provide it to one vendor but that doesn't

sound like something we would be able to do." *Id.*

Despite the repeated statements of Hanover and the advice of Mr. Marshall, Kex

ultimately chose not to obtain a policy for contingent cargo coverage. As Mr. Gilson explained at

his deposition, "even though [Mr. Marshall's] claiming it was necessary, in our further

conversations, I was not convinced of it being necessary; that it was a gray area; and that we had

coverage in place with our current coverages." Dkt. No. 64-4 at 112 (111:9–13).

Apparently, Mr. Gilson followed the advice of a different insurance agent at Cincinnati

Financial, who told him that Kex did not need contingent cargo coverage. As Mr. Gilson further

testified at his deposition, "I still couldn't get clarity as to why I needed it in addition to the

4

coverage we currently had, especially when the gentleman that I was speaking with at Cincinnati said, I don't think you need that type of coverage." *Id.* at 119 (118:4–7); *see also* Dkt. No. 64-17 at 2–3 (referring to advice from the "Cincinnati guy").

In all events, Kex went ahead with securing insurance from Hanover and Hanover issued a motor truck cargo insurance policy to Kex that took effect on November 15, 2018. *See* Dkt. No. 2-2 at 2.

**B.**

As relevant here, the policy provided as follows:

**AGREEMENT**

In return for "your" payment of the required premium, "we" provide the coverage described herein subject to all the "terms" of the Motor Truck Cargo Legal Liability Coverage. This coverage is also subject to the "schedule of coverages" and additional policy conditions relating to assignment or transfer of rights or duties, cancellation, changes or modifications, inspections, and examination of books and records.

. . .

**COVERAGE**

1. **Legal Liability Coverage** — "We" cover "your" legal liability for loss to covered property:

    a. while under "your" care, custody, and control; and

    b. that "you" become legally obligated to pay as a common or contract carrier under a bill of lading, contract of carriage, or shipping receipt that is issued by "you" or that is issued on "your" behalf.

. . .

**PROPERTY COVERED**

1. **Property In Vehicles –**

    a. **Coverage**—"We" cover direct physical loss caused by a covered peril to property of others described on the "schedule

5

of coverages" while in the due course of "transit" including
loading and unloading.

. . .

Dkt. No. 2-2 at 15.

In addition, the policy specified that "the words 'you' and 'your' mean the persons or

organizations named as the insured on the declarations." *Id*. Here, that is only "Kex Distribution,

LLC," *id*. at 2.

## C.

On April 29, 2019, Syndy Villalba, an owner-operator transporting cargo on behalf of

Kex, was robbed at gunpoint. *See* Dkt. No. 64-3 at 16. Although Ms. Villalba was transporting

the cargo under Kex's bill of lading, she was an independent contractor, not a Kex employee. *See*

Dkt. No. 64-4 at 41–43, 190 (40:18–42:22, 189:5–8). And she was driving her own Ford

Econoline E250 Cargo van, not a vehicle that belonged to Kex. *See* Dkt. Nos. 64-4 at 190

(189:5–8), 64-3 at 14.[2]

Approximately two months later, Kex submitted a claim to Hanover under the Policy for

pharmaceutical goods belonging to Cardinal Health that were stolen from Ms. Villalba's van. *See*

Dkt. No. 64-5. Hanover denied the claim on the ground that Ms. Villalba's vehicle was not listed

on the policy's schedule of covered vehicles. *See* Dkt. No. 64-6 at 28 (26:8–12). In February of

2020, Kex requested that Hanover reconsider the coverage denial. *See* Dkt. No. 2-4. In April,

---

[2] Although Kex purports to dispute these facts in its brief opposing summary judgment, the only basis it offers for its dispute is that Ms. Villalba was transporting cargo under Kex's bill of lading. *See* Dkt. No. 69 at 12. To the extent this is legal argument, it cannot create a genuine dispute of material fact and is a *non sequitur* in all events. To the extent it is a factual assertion, it is simply untenable: the evidence identified by the parties leaves no room for dispute that Kex frequently engaged individual contractors who owned their own vehicles to transport cargo for it under its bill of lading. Indeed, at his deposition, Mr. Gilson agreed that "[t]here's no question that the loss in this case involved an independent contractor vehicle driven by an independent contractor." Dkt. No. 64-4 at 190 (189:5–8).

Hanover declined to do so. *See* Dkt. No. 64-11 at 2. Several months later, Kex brought this suit, asserting claims for breach of contract, bad faith breach, breach of the implied covenant of good faith and fair dealing, reformation, negligent misrepresentation, and fraudulent inducement or misrepresentation.[3]

## II.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law"; a "dispute about a material fact" is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For purposes of summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. Applying this well-settled standard, the court concludes that Hanover is entitled to summary judgment on all of Kex's claims.

## A.

The court first addresses Kex's claim for breach of contract. In this court, Hanover argues that its denial was justified not only because Ms. Villalba's vehicle was not listed on the policy's vehicle schedule, but also because the stolen cargo was not in Kex's "care, custody, and control" at the time of the robbery. *See* Dkt. No. 63 at 17–18. Because the court agrees with Hanover's second argument it need not address its first one.

---

[3] Kex also asserted a claim for breach of the duty to procure insurance, as well as a claim for "declaratory judgment." Dkt. No. 72 at 16–18. The former claim is asserted against CSDZ, however, not Hanover, and the latter "claim" is a remedy, not a cause of action, *see Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–241 (1937), so the court will not address it separately from Kex's substantive causes of action.

Again, the "coverage" section of the disputed policy provides in relevant part as follows:

"We" cover "your" legal liability for loss to covered property:

  a.  while under "your" care, custody, and control; and

  b.  that "you" become legally obligated to pay as a common or contract
      carrier under a bill of lading, contract of carriage, or shipping receipt
      that is issued by "you" or that is issued on "your" behalf.

Dkt. No. 2-2 at 15.

Hanover notes that Ms. Villalba was an independent contractor, not a Kex employee, and that the vehicle from which the goods were stolen belonged to Ms. Villalba, not to Kex. It follows, Hanover argues, that the goods were not in Kex's "care, control, and custody" at the time of the loss. In short, Hanover understands this phrase to require actual physical, possessory control. To the extent Kex responds at all to this argument, it contends only that "the vehicle involved in the robbery was under Kex's control because the delivery was made pursuant to Kex's bill of lading." Dkt. No. 69 at 25. This is consistent with the position that Mr. Gilroy took at his deposition, when he asserted that the cargo was "in our control, whether it's on our truck or whether with an independent contractor" because "[i]t's our name on the bill of lading." Dkt. No. 69-1 at 184–85 (118:25–119:6). Although the policy itself does not expressly define the phrase "care, custody, or control," *see* Dkt. No. 2-2 at 29–30, the court concludes that Hanover's reading of this phrase is correct.

As an initial matter, the requirements for coverage are conjunctive. By its express terms, the policy covers losses to covered property "while under 'your' care, custody, and control; *and* that you become legally obligated to pay . . . under a bill of lading, contract of carriage, or shipping receipt that is issued by 'you' or that is issued on 'your' behalf." Dkt. No. 2-2 at 15 (emphasis added). This provision clearly imposes *two* requirements that must be satisfied in order to qualify for coverage. Kex's reading would conflate these two requirements. Kex's

argument that goods delivered under Kex's bill of lading are necessarily under Kex's "care, control, and custody" would require either changing "and" to "or" or reading the first requirement for coverage out of the policy entirely.

Hanover's reading of the phrase "care, custody, and control" is also supported by Tenth Circuit precedent interpreting insurance contracts governed by Utah law.[4] In *Mullin v. Travelers Indemnity Company of Connecticut*, 541 F.3d 1219, 1225 (10th Cir. 2008), the Tenth Circuit considered nearly identical language and explained that "[t]he great majority of the cases . . . support the view that property in the care, custody, or control of the insured refers to possessory handling of the property as distinguished from proprietary control." (quoting Couch on Insurance § 126:22 (3d ed. 2007)). In the same section quoted by the Tenth Circuit, Couch on Insurance further explains that "[p]hysical control is the hallmark of 'care, custody, and control' of another's property."

In *Mullin*, the plaintiffs alleged that their property was stolen by High Mountain employees from a condominium managed by High Mountain where they were staying. *See* 541 F.3d at 1221. Considering a policy exclusion for damage to personal property "in the care, custody, or control of the insured," the Tenth Circuit held that although High Mountain was "the landlord's agent for living quarters occupied by the Mullins," it "did not have the possessory interest in the Mullins' property necessary to establish the exclusion." *Mullin*, 541 F.3d at 1224–25.

---

[4] The insurance policy does not appear to contain a choice of law provision and neither party expressly addresses which State's law governs Kex's claims. Because both parties cite Utah legal authorities and appear to assume that Utah law governs these claims, the court will apply Utah law in ruling on the motions for summary judgment.

By analogy, although Kex may have been legally responsible under its bill of lading for delivery of the stolen cargo, the evidence identified by the parties leaves no room for genuine dispute that Ms. Villalba, not Kex, had actual physical and possessory control of the cargo at the time of the robbery. Certainly, Kex has identified no evidence that suggests it had a key to Ms. Villalba's van or the right to control Ms. Villalba as an employee. To the contrary, the evidence is clear that Ms. Villalba, not Kex, owned the van from which the cargo was stolen and that Ms. Villalba was an independent contractor. As Mr. Gilson acknowledged at his deposition, "[t]here's no question that the loss in this case involved an independent contractor vehicle driven by an independent contractor." Dkt. No. 64-4 at 190 (189:5–8).

For all of these reasons, there can be no genuine dispute of material fact that the stolen cargo was not in the care, custody, or control of Kex at the time of the robbery. It follows, under the plain terms of the policy's coverage provisions, that Hanover is entitled to judgment as a matter of law on Kex's breach of contract claim.[5]

**B**.

The court next turns to Kex's claims for bad faith and for breach of the implied covenant of good faith and fair dealing. The court will address these claims together because "'bad faith' is not generally a distinct cause of action from the breach of the implied covenant of good faith and fair dealing." *Zurich Am. Ins. Co. v. Ascent Constr., Inc.*, No. 1:20-CV-00089-DBB, 2022 WL

---

[5] Because the court resolves Kex's breach of contract claim on this ground, it does not matter whether there are any contractual ambiguities or genuine disputes of fact regarding the correct number of vehicles on the policy schedule or whether the policy should have included a vehicle schedule at all; such ambiguities or disputes are not material to whether the stolen cargo was in Kex's care, custody, and control as required for coverage under the policy. Nor are any ambiguities or factual disputes regarding the types of goods covered by the policy material to this question.

36878 at *4 (D. Utah Jan. 3, 2022); *see also Beck v. Farmers Ins. Exchange*, 701 P.2d 795, 797–98 (Utah 1985).

The covenant of good faith and fair dealing, which is implied in every contract, is that the "contracting parties refrain from actions that will intentionally destroy or injure the other party's right to receive the fruits of the contract." *Young Living Essential Oils, LC v. Marin*, 266 P.3d 814, 816 (Utah 2011) (cleaned up). "But the covenant cannot create rights and duties inconsistent with express contract terms and it cannot compel a contractual party to exercise a contractual right to its own detriment for the purpose of benefitting another party." *Backbone Worldwide Inc. v. LifeVantage Corp.*, 443 P.3d 780, 785 (Utah Ct. App. 2019) (cleaned up).

In the insurance context specifically, courts have held that where the claim for bad faith or breach of the implied covenant of good faith and fair dealing is based on the denial of coverage, the claim fails if the denial was fairly debatable. As the Utah Supreme Court has explained, "when an insured's claim is fairly debatable, the insurer is entitled to debate it and cannot be held to have breached the implied covenant of good faith if it chooses to do so." *Jones v. Farmers Ins. Exchange*, 286 P.3d 301, 304 (Utah 2012) (cleaned up). Here, the denial was not only fairly debatable: it was correct, as already explained.[6]

More generally, Kex's claims fail because its denial of coverage was not discretionary but based on clearly defined criteria. Under Utah law, the implied covenant applies when "the terms of [a] contract" leave the exercise of a contractual right to "the sole and undefined discretion of one party. In such situations, the covenant requires that the party possessing such discretion

---

[6] Because the policy clear exclusion of coverage for cargo not under Kex's "care, custody, and control," this court need not consider whether the alternate basis for Hanover's denial—the absence of Villalba's van from the policy's vehicle schedule—was "fairly debatable." *See* Dkt. No. 69 at 28–29.

exercise it in a good faith, objectively reasonable manner." *Backbone*, 443 P.3d at 785. By

contrast, when a party's legal ability to exercise a contractual right

> is not a matter of one-sided, undefined discretion but, instead, is established
> pursuant to objective criteria . . . the implied covenant does not intervene to
> impose an objective reasonableness standard on the party's ability to [exercise
> that right], because the express terms of the contract already objectively afford the
> party that right, and the implied covenant cannot operate to vary express
> contractual rights.

*Id.* at 786.

Here, the provision justifying Hanover's denial of coverage is not discretionary. It simply

states objective requirements for coverage. By denying coverage based on Kex's failure to satisfy

these objective requirements, Hanover cannot be said to have acted in bad faith.

Nor can Defendant be said to have denied Kex the fruits of its bargain, because nothing in

the parties' conversations or the language of the contract could support a reasonable

understanding that the contract was intended to provide coverage for cargo transported by

independent contractors on Kex's behalf. To be sure, the evidence shows conversations both

between Mr. Marshall, the CSDZ agent, and Hanover and between the Mr. Marshall and Mr.

Gilson, Kex's Vice President of Operations, discussing whether Hanover would cover owner-

operators under a motor truck cargo insurance policy issued to Kex. The evidence is clear,

however, that Hanover never agreed to provide such coverage. Not only is such coverage barred

by the plain terms of the policy's coverage provision, as already explained, but Hanover

repeatedly indicated that it would *not* provide such coverage. As Ms. Mares from Hanover put it

in July 2018, "unfortunately [we] can't write the other unknown haulers on our Motor Truck

Cargo form." Dkt. No. 64-13 at 2. Or as Mr. Sexton from Hanover put it three months later, "we

are not a market for haulers that we can't underwrite for. If any of these owner/operators are

12

independent and subcontracting then they will need to have their own coverage in place." Dkt.

No. 64-14 at 2.

Nor can there be any doubt that Mr. Marshall or Kex understood Hanover to suggest

otherwise. To the contrary, after Ms. Mares' email in July, Mr. Marshall sent Mr. Gilson "a semi

completed application" for contingent cargo insurance, Dkt. No. 64-16 at 2, and "highly

recommend[ed]" that Kex take the steps necessary to obtain such insurance and warned that Kex

would be at "high risk" otherwise. Dkt. No. 64-17 at 2. And after Mr. Sexton's October email,

Mr. Marshall responded, "that's what they thought they just wanted to reconfirm" and "[t]hey

were hoping to just provide it to one vendor but that doesn't sound like something we would be

able to do." Dkt. No. 64-14 at 2.

For all of these reasons, Hanover is entitled to summary judgment on Kex's claims for

bad faith and breach of the implied covenant of good faith and fair dealing.

### C.

The court next addresses Kex's claims for negligent misrepresentation and fraudulent

inducement. To establish a claim for fraudulent inducement, a plaintiff must show:

> (1) that a representation was made (2) concerning a presently existing material
> fact (3) which was false and (4) which the representor either (a) knew to be false
> or (b) made recklessly, knowing that there was insufficient knowledge upon
> which to base such a representation, (5) for the purpose of inducing the other
> party to act upon it and (6) that the other party, acting reasonably and in ignorance
> of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to
> that party's injury and damage.

*Daines v. Vincent*, 190 P.3d 1269, 1279 (Utah 2008) (ultimately quoting *Gold Standard Inc. v.*

*Getty Oil Co.*, 915 P.2d 1060, 1066–67 (Utah 1996)).

"The elements of negligent misrepresentation are similar to those of fraud except that

negligent misrepresentation 'does not require the intentional mental state necessary to establish

fraud.'" *Shah v. Intermountain Healthcare, Inc.*, 314 P.3d 1079, 1085 (Utah Ct. App. 2013)

(quoting *Price-Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc.*, 713 P.2d 55, 59 n.2 (Utah 1986)); *see also Smith v. Frandsen*, 94 P.3d 919, 922 (Utah 2004) (explaining that negligent misrepresentation may be established where the false representation is made "carelessly or negligently" with the expectation that it will be relied on).

The court concludes that Kex has failed to identify a single misrepresentation by either Hanover itself or by an agent representing Hanover.[7] It does appear, based on his deposition testimony, that Mr. Gilson concluded that Kex did not need to secure contingent cargo coverage. *See* Dkt. No. 64-4 at 118–19 (117:15–118:8). But his deposition testimony and the other evidence identified by the parties makes clear that Mr. Gilson drew this conclusion in direct opposition to the advice he received from Mr. Marshall and in reliance on advice from a different insurance agent at Cincinnati Financial.

---

[7] Kex does argue that Hanover represented that the Policy provided contingent cargo coverage for owner-operators, therefore making a misrepresentation, when it confirmed by email on October 5, 2018 that the policy "covered 'any one conveyance and any one vehicle.'" Dkt. No. 69 at 31 (quoting 69-1 at 268). But this is not what the email says. Rather, the email states that the coverage "limit" for "any one conveyance and any one vehicle is $1,250,000." *See* Dkt. No. 69-1 at 268. The email's explanation of the coverage limit for cargo carried in a single vehicle cannot plausibly be understood as a representation regarding which vehicles are covered under the policy, particularly in the light of the coverage provisions' unambiguous requirement that a covered loss occur while the property is under Kex's "care, custody, and control."

Nor is a different understanding of the email supported by the policy's definition of "vehicle" as "any one vehicle, truck, tractor, 'trailer', or combination of these pulled by one power unit." *See* Dkt. No. 69 at 26 (quoting from Dkt. No. 2-2 at 30). Defining what the term "vehicle" means says nothing at all about *which* vehicles are covered by the policy. Kex surely could not have thought that Hanover would cover any loss from "*any* one vehicle, truck, tractor, 'trailer,' or combination of these" regardless of the other policy provisions—indeed, on such a reading, the whole driving public could show up at Hanover's door with their bills.

In all events, less than two weeks after the October 5th email, Mr. Marshall again raised the "question of coverage for owner-operators" with Hanover on Kex's behalf, was told by Mr. Sexton for Hanover that "owner/operators… will need to have their own coverage in place," and replied, "Sounds good, that's what they thought they just wanted to reconfirm." Dkt. No. 64-14 at 2–3.

When asked to summarize his understanding of Mr. Marshall's advice, Mr. Gilson stated: "I understood him to be saying that the contingent cargo coverage helped ensure that cargo by— carried by non-owned and hired would be covered because it was a grey area, or it was—it was—even though we had that policy in place, that coverage in place, this was an additional layer of coverage that he felt would help us for these—for the risks—exposures that we had with our non-owned and hired." *Id.* at 116 (115:10–17). And when asked why Kex did not purchase contingent cargo coverage, he explained: "we talked about it a bunch, and I still couldn't get clarity as to why I needed it in addition to the coverage we currently had, especially when the gentleman that I was speaking with at Cincinnati said, I don't think you need that type of coverage. That's how I felt." *Id.* at 119 (118:3–8).

But even if Kex could identify an actual misrepresentation on Hanover's part regarding owner-operator coverage, its claims would still fail because reliance on such a misrepresentation would have been patently unreasonable in light of the clear language found in the policy. Under Utah law, reliance on an oral statement that is plainly contradicted by the clear language of a written agreement is generally unreasonable as a matter of law. *See Gold Standard*, 915 P.2d at 1068. (To be sure, a fraudulent inducement claim can still be maintained where such oral statements themselves acknowledge and falsely explain away the discrepancy between the oral representations and the written provisions, but nothing of that sort occurred here. *See The Cantamar, LLC v. Champagne*, 142 P.3d 140, 150 (Utah Ct. App. 2006).)

Kex also argues that it relied on Mr. Marshall's knowledge of the terms and conditions of its previous insurance policy and therefore that it was reasonable for Kex to believe that the new policy would contain the same terms and conditions. *See* Dkt. No. 72 at ¶ 69. But any such reliance would have been unreasonable as a matter of law given the clear language of the policy,

15

Hanover's repeated statements that it would not cover cargo transported by owner-operators, and

Mr. Marshall's forceful advice that Kex needed to obtain contingent cargo coverage.

Further, to the extent Hanover's failure (or refusal) to provide the same coverage that Kex

claims it had under its previous policy *could* somehow be construed as a form of a

misrepresentation that Kex relied upon in some fashion, that alone would not save Kex's claims.

Although "[f]ormerly it was held that if there was what is called a *scintilla* of evidence in support

of a case the judge was bound to leave it to the jury," the Supreme Court has now made clear

> that in every case, before evidence is left to the jury, there is a preliminary
> question for the judge, not whether there is literally no evidence, but whether
> there is any upon which a jury could properly proceed to find a verdict for the
> party producing it, upon whom the *onus* of proof is imposed.

*Anderson*, 477 U.S. at 251 (cleaned up). The asserted terms of the former policy are, at most, a

scintilla of evidence that fall far short of establishing a genuine dispute of material fact that

would foreclose summary judgment for Hanover on Kex's claims for negligent misrepresentation

and fraudulent misrepresentation or inducement.

**D.**

Finally, this court turns to Kex's claim for policy reformation. Contract reformation is an

equitable remedy in the exercise of which "a court's . . . powers are narrowly bounded." *Briggs v.*

*Liddell*, 699 P.2d 770, 772 (Utah 1985). There are two general grounds for reforming written

instruments that do not correctly embody the intention and pre-existing agreement of the parties

to the instrument: "(1) mutual mistake of the parties and (2) ignorance or mistake of the

complaining party coupled with or induced by the fraud or inequitable conduct of the other

remaining parties." *Thompson v. Smith*, 620 P.2d 520, 523 (Utah 1980) (cleaned up).

Either way, "courts are reluctant to change contractual obligations and rights" and the

party seeking reformation must therefore both "plead the circumstances constituting the mistake

with particularity" and also prove those circumstances by clear and convincing evidence, "clinch[ing] what might be otherwise only probable to the mind." *Briggs*, 699 P.2d at 772. Given the court's resolution of Kex's other claims, the reformation claim fails as well.

First, Kex has failed to show any evidence of *mutual* mistake, let alone clear and convincing evidence. None of the evidence identified by the parties provides any reason to believe that *Hanover* ever thought its policy would cover owner-operators. To the contrary, Hanover's representatives repeatedly voiced the opposite position.

Second, even if there was unilateral mistake on Kex's part, Kex would also need to show by clear and convincing evidence that Hanover engaged in either fraud or inequitable conduct. But regardless of whether Kex misunderstood the policy, it has failed to identify *any* evidence that Hanover bore even partial responsibility for its misunderstanding—let alone that the misunderstanding was attributable to fraud or inequitable conduct on Hanover's part. To the extent the evidence suggests anyone is to blame for Kex's refusal to follow Mr. Marshall's advice and obtain contingent cargo insurance, it would be Mr. Gilson himself and the "Cincinnati guy"—not Hanover and not Mr. Marshall. The fact that Mr. Gilson chose to follow a third party's advice despite the clear language of the policy, Hanover's repeated explanations that it would not cover owner-operators, and Mr. Marshall's forceful recommendation and warning provides no basis for reformation. It follows that Hanover is entitled to summary judgment on this claim as well.[8]

---

[8] Because Hanover has shown that it is entitled to summary judgment on each of Kex's substantive claims, the court need not separately consider Hanover's request for summary judgment on the declaratory and punitive relief Kex seeks.

*     *     *

For the foregoing reasons, Hanover's motion for summary judgment is **GRANTED**. And in light of the disposition of Hanover's motion, Kex's motion for partial summary judgment on the issue of damages is **DENIED AS MOOT**.

      **IT IS SO ORDERED**.

September 30, 2024
_____
*Date*

BY THE COURT:

_____
Howard C. Nielson, Jr.
United States District Judge